834 F.2d 611
 45 Fair Empl.Prac.Cas. 752,
45 Empl. Prac. Dec. P 37,623,
2 Indiv.Empl.Rts.Cas. 1239
Joseph F. FALLS, Plaintiff-Appellant,
v.
The SPORTING NEWS PUBLISHING COMPANY; Richard Waters; and
Tom Barnidge, Defendants-Appellees.
 No. 86-1548.
 United States Court of Appeals,
Sixth Circuit.
 Argued May 22, 1987.
Decided Dec. 3, 1987.
Rehearing and Rehearing En Banc Denied Jan. 15, 1988.
 
 Deborah L. Gordon, Stark & Gordon, Detroit, Mich., Clark D. Cunningham (argued), University of Michigan Law School, Ann Arbor, Mich., for plaintiff-appellant.
 Herschel P. Fink (argued), William D. Sargent, Honigman, Miller, Schwartz and Cohn, Detroit, Mich., for defendants-appellees.
 Before KEITH and NORRIS, Circuit Judges, and PECK, Senior Circuit Judge.
 ALAN E. NORRIS, Circuit Judge.
 
 
 1
 Plaintiff, Joseph F. Falls, appeals from the judgment of the United States District Court for the Eastern District of Michigan, granting summary judgment to defendants, Richard Waters, Tom Barnidge, and The Sporting News Publishing Company. In his complaint, plaintiff characterized this diversity action as one "to enforce civil and common law rights arising out of Plaintiff's employment relationship with Defendant, pursuant to the Elliott-Larsen Civil Rights Act, M.C.L.A. Sec. 37.2101 et seq., and the Michigan common law." The three counts of the complaint were predicated upon age discrimination, defamation, and injurious falsehood.
 
 
 2
 Plaintiff was fifty-seven years old when his complaint was filed, and had been a sports writer for over thirty-five years. He was sports editor of the Detroit News, and also contributed a weekly column to the The Sporting News (TSN), a weekly newspaper, from 1963 until June 1985, when defendant Tom Barnidge, TSN's editor, discharged him. He received $90 per column from TSN.
 
 
 3
 The parties disagree on the proper characterization of plaintiff's relationship with TSN. While he refers to himself as a part-time employee, TSN maintains that he was an independent contractor contributing part-time piece work or free lance writing assignments. It is undisputed, though, that plaintiff's compensation fron TSN was reported on IRS Form 1099, and not on a W-2 Form, as was the case for compensation paid to TSN's "employees"; that there was no formal contract of employment between plaintiff and TSN; that TSN provided plaintiff with no formal office space or equipment except for a telephone credit card with which he was to charge his phone calls to TSN; that plaintiff has been identified by the public as a TSN writer and received fan mail addressed to him at TSN; that he was not reimbursed for travel or other business expenses by TSN and did not receive traditional "employee benefits" from TSN; that his columns were submitted pursuant to deadlines set by TSN, which edited them before publication; that plaintiff was required to produce original columns for TSN and was told to cover specific sporting events; and that TSN provided him with sports research materials.
 
 
 4
 Plaintiff alleged that two other columnists over the age of fifty-five were also discharged and replaced by younger writers, and that he had been defamed by a letter written by Barnidge in response to a reader's inquiry, and by an interview given by TSN's president, defendant Richard Waters, to USA Today, a nationally distributed newspaper.
 
 
 5
 On January 31, 1986, plaintiff filed this action. Rather than answer the complaint, defendants filed a motion for summary judgment and, before full discovery was completed, the district court granted summary judgment on May 22, 1986.
 
 
 6
 Plaintiff contends that the district court erred in these regards: (1) by granting summary judgment before discovery had been completed; (2) in holding that an independent contractor is not protected under the Michigan civil rights act; (3) by improperly applying the common law master-servant analysis in determining that plaintiff was not an "employee" protected from age discrimination under the act; (4) in determining that statements made about plaintiff did not ground a cause of action for defamation; and (5) by holding that a cause of action was not pleaded for the tort of injurious falsehood. Because we agree with plaintiff's positions on some of these issues, we reverse the district court and remand for further proceedings.
 
 
 7
 Plaintiff's claim of age discrimination was brought pursuant to the Elliott-Larsen Civil Rights Act, Sec. 202(1), Mich. Comp. Laws Sec. 37.2202, which states, in pertinent part:
 
 An employer shall not:
 
 8
 (a) Fail or refuse to hire, or recruit, or discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status.
 
 
 9
 In contending that the district court erred in concluding that his working relationship with TSN was not protected by the Michigan act, plaintiff first maintains that he was not required to prove that he was an employee of TSN since, even if he were an independent contractor, he would be protected so long as his compensation was impacted by TSN because of his age. Although there are no reported cases from Michigan courts specifically addressing the point, plaintiff notes that the terms "individual" and "compensation" are not defined in the act, and argues that they therefore should be construed according to their common usage. He also maintains that, in Michigan, social legislation is liberally construed to ensure sweeping coverage. TSN responds that, because of the similarity of the language and the intended purposes of both the Federal Age Discrimination in Employment Act (ADEA), 29 U.S.C. Sec. 623(a)(1), and Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. Sec. 2000e-2(a), federal decisions construing these statutes are persuasive authority in deciding similar issues under the Michigan act. See Langlois v. McDonald's Restaurants, Inc., 149 Mich.App. 309, 312, 385 N.W.2d 778, 780 (1986). TSN reasons that independent contractors are not protected under the Michigan act because they do not fall within the ambit of the ADEA or Title VII.
 
 
 10
 Although this court has rejected a narrow construction of the term "employee" under both Title VII and the ADEA, it has nevertheless adhered to a standard that would exclude from the protection of either act a person who cannot be considered an employee, but is instead clearly an independent contractor. See Armbruster v. Quinn, 711 F.2d 1332, 1341-42 (6th Cir.1983) (Title VII); EEOC v. First Catholic Slovak Ladies Ass'n, 694 F.2d 1068, 1070 (6th Cir.1982), cert. denied, 464 U.S. 819, 104 S.Ct. 80, 78 L.Ed.2d 90 (1983) (ADEA). Because the Michigan act is so similar to Title VII and the ADEA, and Michigan courts regard federal precedent on questions analogous to those presented under Michigan's civil rights statutes as highly persuasive [Langlois v. McDonald's Restaurants, Inc.], we may assume that Michigan courts would follow our precedents and interpret the state act to limit its coverage to employees.
 
 
 11
 The question then remains whether the district court erred in failing to conclude that plaintiff was an employee of TSM, for purposes of the Michigan act. Plaintiff maintains that the "District Court should have eschewed a simplistic common law distinction between employees and independent contractors, and instead, made a detailed analysis of all the factors involved in the working relationship between Plaintiff and Defendants." Had the court done so, he argues, it would have concluded that plaintiff was an integral part of TSN's business. On the other hand, TSN presents a number of cases containing employment situations similar to plaintiff's, which TSN uses to support its contention that he was an independent contractor.
 
 
 12
 Whether or not plaintiff was an employee of TSN, as contemplated by the Michigan act, must be resolved by reference to an "economic reality" test developed by Michigan courts to replace the common law "control" test. See, e.g., Wells v. Firestone Tire & Rubber Co., 421 Mich. 641, 364 N.W.2d 670 (1984); Askew v. Macomber, 398 Mich. 212, 247 N.W.2d 288 (1976). This requires viewing an employment situation as a whole in relation to the statutory scheme contemplated by the Michigan act. Control of the worker's duties, payment of wages, authority to hire and fire, and responsibility for the maintenance of discipline, are all factors to be considered, but no one factor is controlling. Wells v. Firestone Tire & Rubber Co., 421 Mich. at 647-48, 364 N.W.2d 670. Whether TSN was plaintiff's employer, then, will depend upon the economic realities of their relationship, and among the relevant factors that will demonstrate an employment relationship are those listed above, as well as whether the duties performed by plaintiff were an integral part of TSN's business and contributed to the accomplishment of a common goal. Askew v. Macomber, 398 Mich. at 217-18, 247 N.W.2d 288. Other factors to be considered were listed by the Michigan Court of Appeals in McKissic v. Bodine, 42 Mich.App. 203, 208-09, 201 N.W.2d 333, 335-36 (1972). Establishment of an independent contractor relationship would require a convincing accumulation of factors indicating that plaintiff's services were rendered in the course of his pursuit of his separate business enterprise of selling those services. Hyslop v. Klein, 85 Mich.App. 149, 157, 270 N.W.2d 540, 543-44 (1978).
 
 
 13
 It is not clear from the district court's opinion what test was applied in evaluating the relationship between the parties. From its citation of authorities relying upon control as the determining factor, it would appear that the common law test played a decisive role in the court's analysis. In addition, the summary judgment evidence was conflicting on some of the factors relied upon by the court, such as plaintiff's receiving compensation only for published articles, his not receiving "any benefits" from TSN, and TSN not having exercised any control over plaintiff's work other than the decision to publish and edit the columns he submitted. Moreover, although plaintiff may not have demonstrated a need for discovery precisely as contemplated by Fed.R.Civ.P. 56(f), nevertheless, we are uneasy that summary judgment was rendered so early in the proceedings, while discovery was still pending. When one considers the uncertainty surrounding the method utilized to evaluate the parties' relationship, the conflict in summary judgment evidence, and the status of discovery, it is apparent that summary judgment was not warranted on plaintiff's age discrimination count.
 
 
 14
 Plaintiff's next issue involves his claim that he was defamed by TSN's editor, Tom Barnidge, when, in response to a reader's inquiry, Barnidge wrote: "I know Joe brightened a lot of hearts with his column through the years but we felt it was time to make a change, with more energetic columnists who attend more events and are closer to today's sports scene." Plaintiff also maintains that he was defamed by TSN's president, Richard Waters, when Waters was quoted in the course of an interview appearing in the September 17, 1985 edition of USA Today, as saying that: "Those who seem to have reached maturity and are on the downswing are giving way to some of the up-and-coming young writers who we think deserve a chance."
 
 
 15
 Plaintiff contends that the district court erred in deciding that the two statements made by the defendants were not capable of a defamatory meaning as a matter of law and, in any event, were opinions.
 
 
 16
 The elements of a defamation claim in Michigan are: (1) that the defendant published a false and defamatory statement concerning the plaintiff; (2) that the statement was an unprivileged communication to a third person; (3) that the defendant was at least negligent in making the statement; and (4) that the statement caused damage to the plaintiff. Ledl v. Quik Pik Food Stores, Inc., 133 Mich.App. 583, 589, 349 N.W.2d 529, 532 (1984). A defamation claim may be disposed of by summary judgment if the statement in issue is not reasonably capable of a defamatory meaning. Clark v. American Broadcasting Cos., 684 F.2d 1208, 1213 (6th Cir.1982), cert. denied, 460 U.S. 1040, 103 S.Ct. 1433, 75 L.Ed.2d 792 (1983). However, if the statement could be given either a defamatory or a nondefamatory meaning, summary judgment must be denied and the case submitted to the jury. See Michigan United Conservation Clubs v. CBS News, 485 F.Supp. 893, 902 (W.D.Mich.1980), aff'd, 665 F.2d 110 (6th Cir.1981).
 
 
 17
 Under Michigan law, a communication is defamatory "if it tends so to harm the reputation of another as to lower him in the estimation of the community or deter third persons from associating or dealing with him." Nuyen v. Slater, 372 Mich. 654, 662, 127 N.W.2d 369, 374 (1964). Also, a statement is defamatory per se if it is injurious to a person in his or her business. Heritage Optical Center, Inc. v. Levine, 137 Mich.App. 793, 797, 359 N.W.2d 210, 212 (1984). Circumstances surrounding statements uttered should also be considered. Ledsinger v. Burmeister, 114 Mich.App. 12, 21-22, 318 N.W.2d 558, 563 (1982). This is necessary because the statement's context may be used to infer a defamatory meaning into an apparently nondefamatory statement. See, e.g., Schultz v. Reader's Digest Ass'n, 468 F.Supp. 551, 554 (E.D.Mich.1979).
 
 
 18
 Defendants Barnidge and Waters contend that their statements are absolutely privileged under the first amendment as opinions. They also claim that the statements fall under the common law fair comment privilege.
 
 
 19
 At common law, an expression of opinion could be defamatory, although certain opinions on matters of public concern could qualify as forms of privileged criticism, protected in the name of "fair comment." Restatement (Second) of Torts Sec. 566 (1977). According to the Restatement, there are two kinds of expressions of opinion. The simple expression of opinion, or the pure type, occurs when the maker of the comment states the facts on which he bases his opinion of the plaintiff and then expresses a comment as to the plaintiff's conduct, qualifications or character. The statement of facts and the expression of opinion were treated separately at common law, in the sense that either or both could be defamatory. A pure type of opinion may also occur when the maker of the comment does not express the facts on which he bases his opinion, but both parties to the communication know the facts or assume their existence and the comment is clearly based on those assumed facts and does not imply the existence of other facts in order to justify the comment. The privilege of fair comment was said to apply to the pure type of opinion. Id. at 171.
 
 
 20
 The second kind of opinion, or the mixed type, is one which, while an opinion in form or context, is apparently based on facts regarding the plaintiff or his conduct that have not been stated by the defendant or assumed to exist by the parties to the communication. Here, the expression of the opinion gives rise to the inference that there are undisclosed facts that justify the forming of the opinion expressed by the defendant. Id. at 172. The Supreme Court, in Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), determined that the common law rule, that an opinion of the pure type may be the basis of an action for defamation, offends the first amendment guarantee of freedom of speech. Orr v. Argus-Press Co., 586 F.2d 1108, 1114 (6th Cir.1978), cert. denied, 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979).
 
 
 21
 However, the mixed type of expression of opinion may still be the basis for an action for defamation, since it implies the allegation of undisclosed defamatory facts as the basis for the opinion. See Orr v. Argus-Press, 586 F.2d at 1115; Restatement (Second) of Torts Sec. 566 at 172. It is the function of the court to determine whether an expression of opinion is capable of bearing a defamatory meaning because it may reasonably be understood to imply the assertion of undisclosed facts that justify the expressed opinion about the plaintiff or his conduct, and the function of the jury to determine whether that meaning was attributed to it by the recipient of the communication. Id. at 173.
 
 
 22
 In arriving at its decision, the district court apparently treated the statements as expressions of opinion of the pure type; we find no discussion in the court's order of dismissal of whether the statements imply the allegation of undisclosed defamatory facts.
 
 
 23
 The Restatement provides two illustrations that point out the distinction between the two types of expressions of opinion:
 
 
 24
 3. A writes to B about his neighbor C: "I think he must be an alcoholic." A jury might find that this was not just an expression of opinion but that it implied that A knew undisclosed facts that would justify this opinion.
 
 
 25
 4. A writes to B about his neighbor C: "He moved in six months ago. He works downtown, and I have seen him during that time only twice, in his backyard around 4:30 seated in a deck chair with a portable radio listening to a news broadcast, and with a drink in his hand. I think he must be an alcoholic." The statement indicates the facts on which the expression of opinion was based and does not imply others. These facts are not defamatory and A is not liable for defamation.
 
 
 26
 Id. at 174.
 
 
 27
 The first illustration is of the mixed type of opinion and the second of the pure type.
 
 
 28
 In the newspaper article, Waters was quoted as using the phrase "reached maturity and on the downswing," which, when taken in context, could be construed as referring to plaintiff. Whether or not a person has "reached maturity" may be a statement of fact, and insofar as plaintiff is concerned, it could not be false. It also might be viewed as a derogatory opinion, a mild form of ridicule, but it reasonably could not be regarded as defamatory. See Restatement (Second) of Torts Sec. 559 (1977). However, the statement that plaintiff was "on the downswing" is capable of bearing a defamatory meaning since a jury could reasonably find that it implied that Waters knew undisclosed facts that would justify such an opinion--for example, that plaintiff's writing and reasoning abilities had deteriorated, or that the quality of his work had declined to the point that others had to rewrite or cover for him. Accordingly, summary judgment was not warranted on that portion of Waters' statement.
 
 
 29
 Similarly, Barnidge's letter can be construed, by negative implication, as an expression of opinion that plaintiff was inferior to his replacements because he was less energetic than other columnists, attended fewer events, and was not as close as they to the current sports scene. This comment creates a reasonable inference that it is justified by the existence of undisclosed facts, such as, for example, that plaintiff did not work hard or he was prevented by his physical condition from exerting himself; that he did not frequently attend sports events to obtain first-hand knowledge of the events reported in his sports columns; and that he was out-of-touch with current sports personalities, an outsider who lacked good "sources." Obviously, these kinds of undisclosed facts could be defamatory. In the alternative, the letter can be viewed as expressing a derogatory opinion of plaintiff--that he was inferior to his replacements--based on Barnidge's own statement as fact that the new writers were more energetic, attended more events, and were closer to the sports scene. If these stated facts were found to be false and defamatory, Barnidge would be subject to liability for the factual statements but not for the expression of opinion.
 
 
 30
 Under either characterization, summary judgment was improperly granted on the basis of the contents of the letter.
 
 
 31
 Plaintiff's last claim is that the district court erred in dismissing his injurious falsehood claim. The court noted that plaintiff failed to plead that the allegedly false statements resulted in special damages to him in the form of pecuniary loss, and held that, in any event, the statements in question were not false because they amounted to opinions and that the tort of injurious falsehood is subject to the same first amendment defenses as defamation.
 
 
 32
 The elements of this tort are set forth in Restatement (Second) of Torts Sec. 623A (1977):
 
 
 33
 One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if
 
 
 34
 (a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and
 
 
 35
 (b) he knows that the statement is false or acts in reckless disregard of its truth or falsity.
 
 
 36
 The district court granted defendants' summary judgment motion on plaintiff's claim for injurious falsehood for much the same reason as it dismissed the defamation claim--that the statements that plaintiff found objectionable were not false, as they amounted to opinions. In view of our disposition of plaintiff's defamation claim, it follows that the district court erred in relying upon that rationale to dispose of the injurious falsehood claim.
 
 
 37
 Defamation deals with pecuniary loss inflicted by interference with plaintiff's personal reputation as the result of a published falsehood. By contrast, the tort of injurious falsehood addresses pecuniary loss inflicted by interference with plaintiff's property by publishing a falsehood. W. Keeton, Prosser and Keeton on the Law of Torts 962 (5th ed. 1984). For example, where defendant falsely disparages to a third-party plaintiff's real property title with the result that plaintiff loses a sale to the third party, defendant has interfered with plaintiff's economic interest in his land by publishing a falsehood.
 
 
 38
 A false statement that casts aspersion upon both an individual personally and upon that individual's tangible or intangible property interest may result in damages to either the individual's reputation or his or her pecuniary interests or both. In such cases ... the torts of injurious falsehood and defamation may overlap. When two torts overlap, the plaintiff may bring suit for both torts as long as damages are not duplicated.
 
 
 39
 Kollenberg v. Ramirez, 127 Mich.App. 345, 353, 339 N.W.2d 176, 179 (1983) (citation omitted).
 
 
 40
 Special damages in the form of pecuniary loss must be pleaded and proved. W. Keeton at 967; Restatement (Second) of Torts Sec. 623A comment f. Here, plaintiff would have to show that the facts (whether disclosed or undisclosed) upon which Barnidge based his opinion that plaintiff was inferior to his replacements were false, and that his pecuniary interest was harmed as the result of a third party's reliance upon them. Under the circumstances of this case, that might be established, for example, by proof that the letter was communicated to another newspaper which refused to run plaintiff's columns as the direct result of Barnidge's disparagement of plaintiff's work product-- e.g., because his columns were not based on first-hand knowledge or good sources. Plaintiff could not prove pecuniary loss, for example, merely by establishing that another newspaper declined to use his columns upon learning that TSN had dropped the columns.
 
 
 41
 Although plaintiff's complaint does not allege that defendants' conduct interfered with a specific relationship between plaintiff and a third party which resulted in pecuniary loss, that was not the basis for the dismissal of the injurious falsehood claim. Accordingly, upon remand, plaintiff should be afforded the opportunity to properly plead and prove this tort.
 
 
 42
 The judgment of the district court is vacated, and this cause is remanded to the district court for further proceedings.